```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF HAWAII

 3    UNITED STATES OF AMERICA,        ) CRIMINAL NO. 01-00094HG
                                       )
 4              Plaintiff,             )
                                       )
 5         vs.                         )
                                       )
 6                                     )
      JON KEVIN MORRIS,                )
 7                                     )
                Defendant.             )
 8    _____)
                                       )
 9    UNITED STATES OF AMERICA,        ) CRIMINAL NO. 01-00132SOM
                                       )
10              Plaintiff,             )
                                       )
11         vs.                         )
                                       )
12                                     )
      (01) KIL SOO LEE,                )
13                                     )
                Defendant.             )
14    _____)
      UNITED STATES OF AMERICA,        ) CRIMINAL NO. 02-00062ACK
15              Plaintiff,             )
                                       )
16                                     )
           vs.                         )
17                                     )
                                       )
18    THOMAS MITCHELL SCHNEPPER,       )
                                       )
19              Defendant.             )
      _____)
20    UNITED STATES OF AMERICA,        ) CRIMINAL NO. 02-00273HG
                                       )
21              Plaintiff,             )
                                       )
22         vs.                         )
                                       )
23                                     )
      (02) DANIELLE ISHIMURA,          )
24                                     )
                Defendant.             )
25    _____)
```

```
 1                    TRANSCRIPT OF PROCEEDINGS

 2           The above-entitled matter came on for hearing on

 3    Thursday, December 18, 2003, at 10:10 a.m., at Honolulu, HI

 4    BEFORE:          THE HONORABLE HELEN GILLMOR
                       THE HONORABLE SUSAN OKI MOLLWAY
 5                     THE HONORABLE ALAN C. KAY
                       United States District Judges
 6
      REPORTED BY:     STEPHEN B. PLATT, RMR, CRR
 7                     Official U.S. District Court Reporter

 8    APPEARANCES:     CRAIG G. NAKAMURA, ESQ.
                       MICHAEL ROTKEY, ESQ.
 9                     U.S. Attorney's Office
                       300 Ala Moana Boulevard, Suite 6100
10                     Honolulu, Hawaii  96813

11                                    Attorneys for the Government

12                     PETER C. WOLFF, JR., ESQ.
                       300 Ala Moana Boulevard, Suite 7102
13                     Honolulu, Hawaii  96813

14                                    Attorney for Defendant
                                        Jon Kevin Morris
15
                       EARLE A. PARTINGTON, ESQ.
16                     1001 Bishop Street, Suite 1330
                       Honolulu, Hawaii  96813
17
                                      Attorney for Defendant
18                                      Kill Soo Lee

19                     PAMELA O'LEARY TOWER, ESQ.
                       1001 Bishop Street, Suite 1330
20                     Honolulu, Hawaii  96813

21                                    Attorney for Defendant
                                        Thomas Schnepper
22
                       PAMELA BYRNE, ESQ.
23                     300 Ala Moana Boulevard, Suite 7102
                       Honolulu, Hawaii  96813
24
                                      Attorney for Defendant
25                                      Danielle Ishimura
```

3

1  THURSDAY, DECEMBER 18, 2003                    10:10 A.M.

2                        -oo0oo-

3       THE CLERK:  Criminal Number 01-94, the United States

4  of America versus Jon Kevin Morris.

5            Criminal Number 01-132, the United States of America

6  versus Kill Soo Lee.

7            Criminal Number 02-62, the United States of America

8  versus Thomas Mitchell Schnepper.

9            And, Criminal Number 02-273, the United States of

10  America versus Danielle Ishimura.

11            These cases are called for hearing on motion to

12  impose sentence without reference to the sentencing guidelines

13  because the guidelines have been rendered unconstitutional by

14  the Protect Act.

15            MR. ROTKEY:  Good morning, Your Honor.

16            Michael Rotkey for the United States in all four

17  cases.

18            JUDGE GILLMOR:  Good morning.  I see Mr. Nakamura is

19  with us, as well.

20            MR. ROTKEY:  Yes, he is.

21            MR. NAKAMURA:  Good morning, Your Honor.

22            MR. WOLFF:  Good morning.

23            Peter Wolff appearing on behalf of Jon Kevin Morris

24  in 01-94.  Your Honor, Mr. Morris is present, but he is in the

25  audience.

1              JUDGE GILLMOR:  Good morning.

2              MR. PARTINGTON:  Good morning, Your Honor.

3              Earle Partington for defendant Kill Soo Lee, who is

4   present in custody with the Korean interpreter.

5              JUDGE GILLMOR:  Good morning.

6              THE INTERPRETER:  Good morning.

7              MS. TOWER:  Good morning, Your Honor.

8              Pamela O'Leary Tower standing in for Richard Kawana,

9   on behalf of Thomas Schnepper, who is present with counsel.

10             JUDGE GILLMOR:  Good morning.

11             JUDGE KAY:  Well, on that point, I want to get

12  Mr. Schnepper's agreement to have Ms. Tower represent you

13  temporarily at this hearing.

14             DEFENDANT SCHNEPPER:  Yes, Your Honor, I do agree.

15             JUDGE KAY:  That's agreeable with you?

16             DEFENDANT SCHNEPPER:  Yes, it is.

17             JUDGE KAY:  All right, the court appoints Ms. Tower

18  as temporary counsel for purposes of this hearing.

19             MS. TOWER:  Thank you, Your Honor.

20             JUDGE GILLMOR:  Could I ask you, Ms. Byrne, to take

21  that microphone and pull it toward you, and pull it up.

22             Go ahead.

23             MS. BYRNE:  Yes, Your Honor.  Good morning.

24             Pamela Byrne is present for Danielle Ishimura.  Her

25  presence is waived; her child is ill today.

1          JUDGE GILLMOR:  Very well, good morning.

2          Okay, before we begin -- the defendants may be

3   seated but I want to check with counsel about timing.  Now, I

4   have a suggestion, and I would like to know whether or not

5   it's agreeable, or, if you have a different suggestion, I

6   would suggest that the government speak for 20 minutes, and

7   the total of the defense be 30 minutes.  And, if that's

8   agreeable to counsel, then we'll check with the defendants.

9          Would you move that mike up, please.

10          MR. ROTKEY:  Yes, I apologize, Your Honor.

11          We don't have any objection to the protocol,

12   subject, of course, to -- if there is extensive questioning

13   that may run over, we might ask the court to indulge us for a

14   few more minutes, but we have no objection.

15          JUDGE GILLMOR:  Certainly.  And I would expect, if

16   there is anything like that, you would ask for more, but I

17   just want to set some ground rules.

18          Mr. Wolff?

19          MR. WOLFF:  I think that's fine, Your Honor,

20   although I don't actually anticipate having 30 minutes' worth

21   of remarks.  And the other --

22          JUDGE GILLMOR:  Well, I am talking total.

23          MR. WOLFF:  But the other counsel, basically, have

24   told me they want to defer to my argument and don't anticipate

25   that they would have much, if anything, to say.  But if there

1    were questions, of course, that were pertinent to a particular

2    defendant that weren't universal to all four, then I would ask

3    that the court address those questions to the person that's

4    likely to know about it.

5              JUDGE GILLMOR:  Very well.

6              MR. PARTINGTON:  That's correct, Your Honor.

7              JUDGE GILLMOR:  Ms. Tower?

8              MS. TOWER:  That's correct, Your Honor.

9              MS. BYRNE:  Yes, Your Honor, we agree.

10             JUDGE GILLMOR:  And the defendants are in agreement

11    with this policy?

12             DEFENDANT SCHNEPPER:  Yes.

13             JUDGE GILLMOR:  Mr. Schnepper has said yes.

14             (Discussion off the record between Mr. Partington

15              and defendant Lee, through the interpreter.)

16             JUDGE GILLMOR:  And, Mr. Wolff, your client is in

17    the audience?

18             MR. WOLFF:  Yes, and he's acknowledged that that's

19    fine with him.

20             JUDGE GILLMOR:  Okay.

21             MR. WOLFF:  Nonverbally.

22             JUDGE MOLLWAY:  Mr. Lee, is that all right with you

23    in terms of the schedule?

24             JUDGE GILLMOR:  If the interpreter would rise and

25    speak.

1          THE INTERPRETER:  Yes, thank you.

2          JUDGE GILLMOR:  Okay.

3          And I would ask that you use the lectern.

4          MR. ROTKEY:  Yes.

5          JUDGE GILLMOR:  Thank you.

6          (Discussion off the record between counsel.)

7          MR. ROTKEY:  I will defer to you; it's your motion.

8          MR. WOLFF:  All right.

9          Good morning.

10          The question that's presented in this case is

11   whether there's really any limit to what Congress can do in

12   setting sentencing policy, or in directing that sentencing

13   policy for the country be handled by a commission.  And it

14   seems to me, and our argument is, that there is a limit, and

15   the Congress has passed the limit with the enactment of the

16   Protect Act.

17          Now, of course, a question similar to this question

18   was decided in Mistretta when the guidelines were first

19   enacted, and so I think we would have to acknowledge that, if

20   this case -- or if the current situation after the Protect Act

21   is undistinguishable from Mistretta, then we lose.  But I

22   think that, and our argument is, that the situation has really

23   changed quite a bit since Mistretta was decided.  And the

24   Protect Act is what changed it.  And so the question, then,

25   for this court, is -- and for the judiciary as a whole -- is,

8

1    who will protect the judicial power, who will say that the

2    Congress or the executive has gone too far, has encroached,

3    has interfered, if the court itself won't?  And the answer is,

4    and the Protect Act demonstrates this, as well, that nobody

5    will.

6            So, it's -- in a way, it could be viewed as --

7    although maybe this is making too much out of it -- sort of a

8    "defining moment" in the history of the judicial power in this

9    country, because if, as the government argues, the Congress

10   can do anything, in terms of deferring questions of what's the

11   proper policy for sentencing to a commission, as long as they

12   do it in pieces, and as long as they don't threaten the judges

13   who exercise the judicial power of the country, as

14   individuals, with reduction of their compensation, or with

15   impeachment, then it seems that the government's argument is

16   that anything could be done.  Because, if what's been done in

17   the Protect Act could be done, there's no reason why the next

18   act couldn't do some more, and the one after that couldn't do

19   some more.

20           And, so, while I'm not really making a slippery

21   slope argument, what I am saying is that -- is that, at some

22   point, even with Mistretta being the law of the land, there

23   has to come a point at which interference with the judicial

24   power to render a judgment in a case has to be acknowledged as

25   an interference.

1          And the particular vice that is presented by the
2     scheme that the guidelines, post-Protect Act, deal with is
3     that -- and the reason I am saying this is because there can't
4     be any doubt that the Congress could enact mandatory
5     sentences, at least no current doubt under the constitution.
6     So, the question is, you have a guidelines commission which
7     does something very similar:  It sets minimum guidelines, it
8     sets maximum guidelines, it tells courts what evidence they
9     consider, what evidence they may not consider, what kind of
10    things they can do, what kind of things they cannot do.  And
11    so what was seen in Mistretta as okay because it was just a
12    fettering of previous existing judicial discretion at some
13    point has to be taking away the judicial power to appoint
14    where the court is no longer, in determining a sentence,
15    rendering its judgment.
16         The notion of judicial power being exercised by the
17    judges of the country, as individuals, is, I think, the proper
18    view of what goes on in the judicial process.  But when that
19    is circumscribed, and how the court must consider something,
20    and what it must consider, and what it may not consider is
21    narrowed, there is an infringement on judicial power.  And,
22    particularly, what has happened here is that Congress, not
23    wanting to do this itself, has deferred it to a commission.
24    And the commission, I think, at this point, given the
25    direction of the Protect Act, can only be properly

1    characterized as a legislative commission.  And, as we know, a

2    legislative commission, that is to say a commission that

3    prescribes laws, conducts the investigation, tells what the

4    policy's going to be, that's a problem.  It's a problem

5    because the constitution requires that Congress enact laws in

6    a particular way, and in a particular procedural fashion, and

7    they can't do something that is inconsistent with that.

8            And, so, really, what it comes down to, in terms of

9    the way the guidelines have been changed, is that the very

10   vice that Justice Scalia identified in his dissenting opinion

11   in Mistretta, has come to pass; that the Congress has changed

12   its mind about what happened with the guidelines in the years

13   since they were enacted and has directed the commission to

14   change the law in accordance with their general wishes.  But

15   they are not willing to enact the law, themselves.

16           And I think, also, there's some doubt about whether

17   they could actually do it if they enacted it directly, because

18   while we have a situation where it seems like you could say,

19   well -- and they've done this -- Congress sets the maximum

20   penalties, they set the minimum penalties; it's not at all

21   clear to me that Congress, by enacting a law directly, could

22   do what the commission has been directed to do.  In other

23   words, that Congress could tell a judge, or all the judges of

24   the country, this evidence, this type of evidence, is

25   irrelevant in sentencing.  Or, this type of evidence is

1    irrelevant in sentencing in a particular category of cases.

2    But yet that is what they've done.

3            The other thing that the Protect Act did is that it

4    enacted a set of reporting requirements and changed various

5    standards of review, and we suggest that that is also an

6    interference with the judicial branch that ought to be

7    recognized as a violation of the doctrine of separation of

8    powers.  And I think it's those provisions which are in force

9    which aren't deferred, and as to which the legislature intends

10    that they apply to all cases post-Protect Act that answer any

11    questions that might exist about, well, how does the Protect

12    Act affect your client if his offense -- my client -- if his

13    offense took place before the Protect Act was passed, before

14    the legislation became law.  Those aspects of the Protect Act

15    went into effect and are intended, by their language, to apply

16    to all cases that would come before the court post April of

17    this year, whenever the exact date was the legislation passed.

18            So, it's really the case that we confront here a

19    question about whether there's any limit to what Congress can

20    do.  And there must be some limit; otherwise, there's no

21    content to the notion of separation of powers, and it's for

22    this court to say whether the limit has been breached.  And I

23    suggest that it has.

24            Now, I would be happy to answer questions, or maybe

25    to save whatever time is available to answer Mr. Rotkey's

1   arguments when he makes them, but I think that we have set

2   forth our arguments in our papers, and so, unless there are

3   questions, I would be prepared to sit down for now.

4           JUDGE GILLMOR:  Judge Kay?  Or Judge Mollway?

5           JUDGE MOLLWAY:  Not right now.

6           MR. WOLFF:  All right.

7           JUDGE KAY:  Well, I'll ask one question:

8           Justice Scalia did write a very strong dissent in

9   Mistretta, but he was the loan dissenter.

10          MR. WOLFF:  Yes.

11          JUDGE KAY:  And, while Title IV imposes further

12  constraints, and some might say onerous tasks on the

13  judiciary, isn't it fair to say that these new constraints

14  still fall within the confines of Mistretta?  Or where would

15  you say they fall outside?

16          MR. WOLFF:  Well, I think they fall outside when

17  you -- they fall outside for -- maybe for two reasons:

18          One is that, what we had when Mistretta was decided

19  was a direction from the Congress to the commission to study

20  the sentencing history and practice of the country and to

21  formulate guidelines that were designed to create national

22  uniformity, or at least to significantly reduce what was

23  viewed as unwarranted disparity between similarly situated

24  defendants.

25          And as I think we demonstrated in our reply

1    memorandum, it was anticipated by the Congress that there

2    would be -- at least the Congress that drafted that

3    legislation -- that there would be a significant number of

4    departures.  One that was consistent was the practice of the

5    parole commission, the one that was consistent with the

6    practice in Minnesota, which had a guideline system similar to

7    what was envisioned for the United States.

8            Then, what we have with the Protect Act, and what's

9    changed -- so what you had was an attempt -- we could debate

10   whether it was successful or not -- but an attempt to apply

11   national standards to the country as a whole, based on

12   historical practices, and based upon the policy judgments made

13   by the Sentencing Commission.

14           But with the Protect Act, we have something, I

15   suggest, quite a bit different, because what the Protect Act

16   directs the commission to do is to change things by

17   significantly curtailing the number of departures, by going

18   through a process that will result in far fewer departures,

19   and that will result in no departures on certain grounds, in

20   certain kinds of cases, and which direct the courts of the

21   country to either refuse to consider certain types of evidence

22   in certain kinds of cases, or to have to consider certain

23   kinds of evidence in certain kinds of cases.

24           And one example would be the third point for

25   acceptance of responsibility, which, up until recently, was a

1    judicial judgment about whether the defendant had done what

2    the guidelines required in order to earn that point.  Now the

3    court has -- it's hard to tell whether the court has any role

4    in the third point.  The court can't award the third point

5    unless the government moves for it.

6            JUDGE KAY:  Well, as far as your client goes, won't

7    the ex-post facto provision bar the application of --

8            MR. WOLFF:  I think so.  Although I think, if I am

9    not mistaken in this case, and I know in other cases the

10   government has gone forward and moved for the third point as

11   though they weren't too sure about the ex-post facto issue --

12   or maybe they want to cover their bases, or whatever.

13           And so, to try to get back to the question, Congress

14   has made a policy decision that there's been too many

15   departures, and they want there to be less.  And so they have

16   directed the commission to change the sentencing policy of the

17   United States.  But I think that the vice in that is that they

18   basically want the Sentencing Commission to legislate.  And

19   that's why we argue that this is a -- has become a legislative

20   commission, and legislation has to be enacted in a particular

21   way; it can't be enacted by a commission, no matter how

22   convenient that it might be that it do so.

23           JUDGE MOLLWAY:  But, following up on Judge Kay's

24   comment, why do we have to go so far as to sentence without

25   reference to the sentencing guidelines, as opposed to using

1    the pre-Protect Act law for clients whose cases were already

2    ongoing at the time the Protect Act was passed?  So the

3    ex-post facto issue that Judge Kay mentioned, why do we have

4    to go to the full extent that your motion seeks?

5         MR. WOLFF:  Well, I think the reason is because it's

6    important to draw a line to protect judicial --

7         JUDGE MOLLWAY:  Right.  But I guess this goes to

8    standing.  It may be that a case that's post-Protect Act would

9    be the proper case in which to examine whether that line had

10   been crossed, but with your client and those others who are

11   here, since they were pre-Protect Act, this might be decided

12   only on an ex-post facto basis, which would not invalidate the

13   application of the guidelines, but only use the pre-Protect

14   Act guidelines.

15        MR. WOLFF:  Well, that would -- I mean, that would

16   be an approach; but, the reporting requirements in the

17   direction of the Department of Justice to report to the

18   Congress the sentencing data, including the names of judges,

19   and so forth --

20        JUDGE MOLLWAY:  Even if we were to say that that was

21   not appropriate, possibly that's also an ex-post facto issue,

22   that, certainly, judges shouldn't have to have all this stuff

23   reported on them on matters that were already in the pipeline,

24   and which they were handling before the Protect Act even

25   kicked in.  I don't know, but that's a possible way to do it

1    and not go the full nine yards in this case, but reserve that

2    issue for some post-Protect Act case.

3              MR. WOLFF:  Right.  And we have asked for that

4    relief as an alternative, although, obviously, we would prefer

5    the -- well, we would prefer any ruling that was in our favor,

6    but the more expansive the better...

7              (Laughter in the court.)

8              MR. WOLFF:  I'm sure that won't be news to the

9    court.

10             (Laughter in the court.)

11             JUDGE KAY:  Wouldn't it be fair to say that the

12   imposition on the judiciary of Title IV is a much lesser

13   imposition than the imposition of the guidelines which was

14   approved by the Supreme Court.

15             MR. WOLFF:  Well --

16             JUDGE KAY:  Is this the straw that breaks the

17   camel's back?

18             MR. WOLFF:  Well, if it isn't the straw that breaks

19   the camel's back then there'll be no straw ever that breaks

20   the camel's back.  In other words, if the government's

21   argument is admitted here and prevails, then there's really no

22   limit that I can see, no principal upon which some court in

23   the future could say, well, now you've gone too far.  Because,

24   what would it be?  I suppose if they passed -- if they

25   directed the commission to single out by name a defendant, or

1   to identify post indictment but before sentencing a class of

2   defendants and pass guidelines that apply to that defendant by

3   name, you know, you could say, okay, we have gone too far.

4   But, barring something like that, it's not clear to me that

5   there would be anything -- if this is okay -- that would not

6   be okay.  Because, here, the Protect Act directs that certain

7   kinds of information that had traditionally and under the

8   guidelines been relevant to departures, like family ties and

9   community service and those things, even though they might be

10  discouraged departures, they were still available in

11  extraordinary cases, those have been eliminated for a

12  particular class of cases.

13          And what would stop the Congress from directing the

14  commission next time to eliminate those considerations in

15  another class of cases?  And then a class after that?  Or to

16  tell the court that, if the defendant is going to have a

17  departure, he must prove his evidence up by a standard beyond

18  a reasonable doubt, but if the government wants an upward

19  departure they can prove it by a preponderance of the

20  evidence.  Or anything like this.  It doesn't seem to be

21  there's any limiting principle that this is okay.

22          And I go back to what Mistretta did -- or what the

23  guidelines did that Mistretta approved, which was to deal with

24  what the Congress identified as a problem; namely, the

25  disparate sentencing across the country.  But now, having

1    accomplished that, and having ended up with a system that

2    was -- at least as far as I'm concerned -- working in

3    accordance with the original framers' intent, in terms of

4    departures, they decided to change national sentencing policy,

5    and to do it by indirect legislation through what we contend

6    now is a legislative commission.

7        JUDGE KAY:  Now promoted from the junior varsity to

8    the varsity --

9        MR. WOLFF:  It's a senior varsity commission because

10   these troubling issues are hard to deal with.  And it's easier

11   to put it in front of a commission of people with no

12   constituents, less well known, and there's no one then to

13   blame.  The individual congressman who votes to enact a

14   particular guideline that causes harsh result in a particular

15   case might get some feedback from one or more of the people

16   who live in his or her district.  But when you put it off to a

17   commission, it's just another relatively more or less

18   anonymous bureaucracy that is enacting the legislation.  And I

19   think that, because of what Article One says in the

20   constitution, about how legislation has to be enacted, that's

21   a problem.

22       JUDGE GILLMOR:  Any other questions?

23       (No response.)

24       JUDGE GILLMOR:  Thank you, Mr. Wolff.

25       Mr. Partington?

1          MR. PARTINGTON:  No, I join in what Mr. Wolff had to

2    say.

3          JUDGE GILLMOR:  Ms. Tower?

4          MS. TOWER:  I join in what Mr. Wolff had to say.

5          JUDGE GILLMOR:  Ms. Byrne?

6          MS. BYRNE:  Yes, we have nothing to add at this

7    time; thank you.

8          JUDGE GILLMOR:  Thank you.

9          The government, please.

10         MR. ROTKEY:  Thank you, Your Honors, and, may it

11   please the court, counsel, again, my name is Michael Rotkey.

12   I am an attorney for the appellate section of the criminal

13   division of the United States Department of Justice in

14   Washington, D.C.  I represent the United States in these four

15   cases, in connection with these pending motions.  And, at the

16   outset, I want to thank the court for accommodating our

17   request for this consolidated proceeding here this morning.

18         Your Honors, the defendants' motion in this case

19   raised a number of issues and supposed concerns based upon the

20   provisions of Title Four of the Protect Act.

21         In our brief in response, what we tried to do was to

22   go through and analyze the specific statutory provisions that

23   the defendants have cited, and to try to explain that

24   notwithstanding their failure to acknowledge the legitimate

25   purposes that are being served here, none of these provisions

1    transgresses any constitutional limitation imposed on the

2    Congress or the executive branch.

3             Neither in their reply brief or again here this

4    morning do we have any specific focus that is being made by

5    the defendants on what is the statutory provision that

6    allegedly violates the constitutional principle of judicial

7    independence that is being invoked.  We have a lot of broad

8    discussion about junior varsity commissions and delegations,

9    and we don't like these things, and Congress has exceeded the

10   limits, but with all due respect, it's not enough to just make

11   the conclusion, we have to look at what allegedly caused there

12   to be this constitutional violation.  What provision in the

13   statute runs afoul of the constitution -- the constitutional

14   principle that's at issue?

15            And what we have submitted, Your Honor, in our

16   brief, after going through each particular provision of the

17   statutes that the defendants have cited, is that none of them

18   comes even close to transgressing the broad constitutional

19   limit of judicial independence on Article Three judicial

20   independence.  And, therefore, we think that Congress acted

21   well within its authority in adopting the reforms that it did

22   here, and that there is no basis upon which to declare -- for

23   the extraordinary act of declaring a federal statute

24   unconstitutional.

25            Now, what I would like to do in the time that's been

1    allotted is to just discuss some of the particular provisions

2    at issue.  And before that, I would like to just begin with a

3    kind of brief overview here.

4              Prior to 1984, Your Honors, federal judges enjoyed

5    virtually unfettered discretion at sentencing; however,

6    predictably, the exercise of such broad discretion led to wide

7    disparity in the sentences that were imposed on similarly

8    situated offenders.  And in the landmark Sentencing Reform Act

9    of 1984, Congress sought to minimize, if not eliminate, these

10   disparities and to achieve certain goals.  And those goals

11   were to bring consistency, fairness and predictability to

12   federal sentencing practices.  And that was the objectives

13   that Congress sought to achieve.

14             To bring about those objectives, the Sentencing

15   Reform Act of 1984 created a multi-member independent agency

16   within the judicial branch, known as the United States

17   Sentencing Commission, and directed the commission to

18   promulgate what are known as the sentencing guidelines.

19             And, as the court well knows, Congress directed that

20   those guidelines establish presumptive sentencing ranges based

21   on offense and offender-specific characteristics.  But yet it

22   reserved to the court the power to depart from those ranges in

23   truly exceptional or extraordinary cases.

24             Now, despite Congress' efforts and intentions,

25   Your Honors, inequity still persisted under the new guidelines

1    regime, this time owing in large part to the excessive

2    reliance on the number of departures that were being imposed.

3              And, so, earlier this year, just as it had in 1984,

4    the Congress adopted legislation designed to address this

5    seemingly intractable problem of unwanted sentencing

6    disparity.  And the question is whether, in adopting the

7    provisions of Title Four of the Protect Act, Congress

8    transgressed the constitutional principle by impermissibly

9    interfering with the independence of the federal judiciary.

10             In our view, Your Honor, the answer is, no.  And

11   what I would like to now do is turn to a discussion of certain

12   of the statutes, or the provisions that have been referenced

13   here this morning.  But, before I do so, I think it's

14   important to just point out the general background principles

15   that I think should inform and guide this court as it

16   considers these questions.

17             And the first principle, Your Honor, is that

18   statutes are presumed to be constitutional.  That, due respect

19   for our elected representatives requires that we begin from

20   the promise that these statutes are legitimate exercises of

21   authority.

22             And the second principle, which is related,

23   Your Honor, is that courts have a duty to construe statutes in

24   a manner that preserves and uphold their constitutionality.

25   And I say this, Your Honor, because, in our view, the

1    defendants have fundamentally turned those principles on their

2    head.  Because they begin from the starting point that this is

3    some kind of mean-spirited legislation that was designed, in

4    their words, Your Honors, to threaten and intimidate the

5    federal judiciary in the performance of their official duties.

6              We think that's not the case and that's not the

7    appropriate starting point.  And as we pointed out in our

8    brief, we believe that each of the provisions of the statute

9    cited by the defendants can -- does serve a number of

10   legitimate justifications.  It's not designed to intimidate

11   the judiciary, and we shouldn't start from that premise.

12             I guess the main provision that I would like to

13   focus on, which was discussed which Mr. Wolff, is the

14   so-called reporting requirements.  These provisions are found

15   in Section 401(L) of the Protect Act and the Attorney

16   General's memorandum from July of this year, which implements

17   that provision.

18             Now, as a prefatory note, Your Honor, much has been

19   written and much has been said about the Protect Act in the

20   press and elsewhere.  And the pleadings submitted by the

21   defendants make reference to a number of news articles that

22   discuss both the Protect Act in general, but also these

23   particular reporting requirements.

24             With all due respect, Your Honors, the government's

25   position is that there are a number of misconceptions and

1    inaccuracies that have been engendered about the purpose,

2    effect and operation of these provisions.  And what I would

3    like to try to do in some of the time that's been given to me

4    this morning is to try to clear the air about some of these

5    misconceptions, and to use the colloquial, to set the record

6    straight.

7          Your Honors, the United States Attorney's manual,

8    which is an internal executive branch policy guide book, has

9    long imposed upon federal prosecutors the duty -- federal

10   prosecutors throughout the country, be it in the U.S.

11   Attorney's Office in Hawaii or Alaska or Florida, it has long

12   imposed upon those offices a duty to report -- and that is

13   simply another word for "notify" -- the Department of Justice

14   in Washington, D.C., where I work, and particularly in the

15   appellate section of the criminal division, of all adverse

16   decisions that are rendered, that are contrary to the

17   government's position.  And that can be a motion to suppress

18   that is granted; it can be the granting of a judgment of

19   acquittal.  Whatever the issue is, there has long been a

20   requirement to notify, report, those facts to the Department

21   of Justice.

22         And those reporting obligations --

23   (incomprehensible) in the U.S. Attorney's manual, flow from

24   the fact that the government occupies a very unique status,

25   because, unlike a particular judge or a particular defendant,

1   the government is a party to every federal criminal

2   proceeding.  And, as a result of that unique status,

3   Your Honor, there are certain obligations that are imposed on

4   the government, and certain restrictions that are imposed on

5   the government.

6         And what these reporting or notification

7   requirements do is, they further legitimate institutional

8   interests that are unique, or particular, to the executive

9   branch.

10        The first interest that is served is, it makes sure

11   that the government is taking consistent litigating positions

12   throughout the country.  We don't want federal prosecutors in

13   Hawaii to take a position on the interpretation of a

14   statute --

15        JUDGE GILLMOR:  Could you slow down a little bit.

16   The court reporter has to write this down, and you are

17   gathering steam here...

18        MR. ROTKEY:  I apologize.  I actually warned the

19   court reporter that my New Yorker in me -- sometimes I get

20   ahead.  I apologize.

21        The -- I'm sorry, Your Honor, I lost my train of

22   thought... it serves a number of important interests.  The

23   first is to ensure consistency of litigating positions.  But

24   the second point, which I think is perhaps most important, is

25   that it serves to keep the solicitor general of the United

1    States apprised as to trends and developments and

2    interpretations of the law throughout the United States.  And

3    the reason that is significant, Your Honors, is that, by

4    regulation, the solicitor general is the Attorney General's

5    designee, who is in charge of supervising and managing all

6    appellate litigation throughout the United States.

7            A federal prosecutor, be it in Hawaii, Florida, or

8    elsewhere, has no authority, or no ability to appeal an

9    adverse ruling that he disagrees with, on his own.  It is only

10   when the solicitor general gives explicit written

11   authorization that such an appeal may be taken.  And that is

12   designed to centralize the process, Your Honors.

13           Now, why do I say all -- well, let me make one other

14   remark here, and that is, adverse decisions, such as motions

15   to suppress, are one thing, but under the pre-Protect Act

16   version of the United States Attorney's manual, sentencing

17   guidelines decisions did not need to be reported -- or

18   notified to the Department of Justice.  And the reason for

19   that, Your Honors, is simply a practical one:  We would be

20   inundated with paperwork if we were required to be notified

21   every time a court granted one point or didn't grant one point

22   that we thought, in terms of calculating the offense level.

23           It was only if the prosecutor wanted to appeal that

24   decision under the guidelines that notice was required,

25   because, again, the solicitor general would need to approve

1    that request.

2            With regard to adverse departure decisions, I can

3    say and represent that federal prosecutors rarely sought

4    authorization to appeal those kinds of decisions.  And that

5    was largely due to the Coon decision, which imposed a highly

6    deferential abuse of discretion standard.  And, as a result,

7    it was very difficult to prove reversible error in connection

8    with the departure.

9            Now, what the Protect Act does, Your Honor -- and I

10   apologize for the length of the background, but I think it's

11   important -- what the Protect Act does is, it seeks to impose,

12   in Section 401(l) more vigorous notification requirements

13   concerning adverse departure decisions; that is, downward

14   departures.  And what the Attorney General has done, pursuant

15   to the statutory authority, is to adopt objective criteria

16   which now -- under which now federal prosecutors, if those

17   criteria are satisfied, they have an affirmative duty to

18   notify the Department of Justice as to that adverse ruling.

19   It does not guarantee that an appeal will be taken.  And it

20   certainly does not, contrary to the analogy that's been

21   suggested by the defendants, it certainly does not give the

22   Attorney General the power to veto a sentence; it doesn't give

23   the Attorney General the power to revise a sentence.  This is

24   pure and simply an intraexecutive branch notification

25   requirement designed to enable the solicitor general to make

1    informed decisions.

2            And, so, the first point that I wanted to make,

3    Your Honors, is that it really is, with all due respect, it's

4    a misconception to view or to treat these reporting or

5    notification requirements as some new directive by the

6    Attorney General, and certainly to view it as a tool of

7    intimidation.  That is not the point.  And, again, consistent

8    with my earlier remarks, we should not be so quick to presume

9    that to be the case.  These provisions serve legitimate

10   institutional interests of the executive branch.

11           And the second point, and perhaps what is most

12   salient to our discussion here today, is that nothing, nothing

13   in the statute or the attorney general's memorandum, in any

14   way gives the executive branch or the Congress any

15   impermissible coercive control or influence over the decisions

16   made by life-tenured and salary-protected Article Three judges

17   in connection with sentencing.

18           As I said before, the executive, by virtue of these

19   reporting changes, has no power to revise a sentence or to

20   conduct review of a sentence.  At most, these provisions are

21   designed to encourage the executive to seek judicial review of

22   a sentence that it disagrees with.  And so any veto of a

23   sentencing departure decision comes from within the Article

24   Three hierarchy.  It doesn't give the executive the power to

25   decree the sentence.

1           And, similarly, the suggestion that Congress somehow

2   has the power to intimidate judges, or to decree what a

3   sentence should be, there's nothing in the statute that

4   supports such a construction.  And, again, the whole idea

5   behind the framers' vision, behind the genius of their vision,

6   the whole reason that Your Honors have been endowed with life

7   tenure and salary protection, is precisely so that you would

8   be immunized from political pressures at the hands of

9   Congress.  In short, there is nothing that Congress can do

10  against an individual Article Three judge because it may

11  disagree with your decision, whether it's to depart or

12  otherwise.  There's no action that can be taken.  That's why

13  you have life tenure.

14          Theoretically, yes, the constitution does permit for

15  impeachment of a federal judge, Your Honors, but, as we

16  pointed out, that power cannot be exercised to retaliate

17  against a judge for his or her official acts in office.  Yes,

18  it can be exercised if a judge evades his taxes or accepts a

19  bribe, because those are unrelated to the exercise of judicial

20  power, but there's no action that can be taken simply because

21  Congress thinks that a judge is departing in ways with which

22  it disagrees as a matter of policy.  That's the way the system

23  works.  If Congress doesn't like it, the way to resolve it is

24  exactly what Congress did here, in Title Four:  It's through

25  the legislative process.  And that's what Congress did.  But

1   the suggestion that there's some -- these reporting

2   requirements are kind of mean spirited, or that they somehow

3   transgress judicial independence -- and there's no support for

4   that.  There's none --

5          JUDGE KAY:  Well, one point that has been raised is

6   that it might discourage and intimidate younger judges in

7   their decisions if they have aspirations of being elevated to

8   a higher court and have to be approved by the Senate judiciary

9   committee.

10          MR. ROTKEY:  Well, Your Honor, with all due respect,

11  that's kind of a hypothetical scenario.  Is it a real one?  I

12  guess... maybe -- but that, to me, seems so far removed and so

13  attenuated that, I mean, to think about it, to say that

14  because of the possibility that an Article Three judge may

15  have aspirations to be appointed to the court of Appeals, I

16  mean, the Senate judiciary committee is going to scrutinize

17  decisions independent of whether or not the executive decides

18  to appeal them or not.

19          It seems to me -- I would certainly defer to

20  Your Honors about the workings of the Senate judiciary

21  committee process, but it seems to me that decisions are going

22  to come under a microscope regardless, and that whether or not

23  the executive chooses to appeal that decision -- there's no

24  way to know.  And there's no way to say that that's kind of

25  the causal factor, or that there's going to be some

1    intimidation, or that judges should refrain from exercising

2    their judicial power because of this potential consideration

3    that may or may not ever manifest itself.

4            Again, I have to defer to Your Honors about the

5    judicial -- about the confirmation process, but -- a similar

6    issue was dealt with in Mistretta, and the Supreme Court found

7    no constitutional infirmity there.  I'm not quite recalling

8    exactly what it was, but I know that there was a specific

9    discussion about judges perhaps wanting to curry favor with

10   the president in order to secure a nomination to the

11   Sentencing Commission.

12           And similar arguments were raised and rejected in

13   Mistretta, and I would just cite that as support.

14           But, again, what it ultimately comes back to is that

15   regardless of aspirations, Your Honor, you have life tenure,

16   you have salary protection, and there are very good

17   fundamental, sound reasons that the framers gave you those

18   protections.  And that is so that you would be insulated from

19   political pressures, in terms of being threatened or

20   intimidated.  And that would be our position as to that point,

21   Your Honors.

22           I don't know if the court -- again, my main focus

23   here was to try to address these reporting requirements and

24   show that there's really nothing sinister about them; that

25   they are really part of a long-standing executive branch

1    practice.

2              I guess the one other observation I would just make

3    concerning those requirements, Your Honors, is that I think

4    there's an irony here, and the irony would be, what we are

5    dealing with is whether Congress somehow violated the

6    separation of powers.  And yet I think for the court, with all

7    due respect, for the court to say that the executive branch's

8    own internal decision-making process about what kinds of

9    decisions should and should be (sic) reported to the Justice

10   Department -- not appealed, just notified or reported -- for a

11   court to say that the executive may not make decisions about

12   which kinds of cases, what kinds of criteria should gauge the

13   reporting, I think that, in and of itself, would raise

14   interesting separation of powers problems.  I think that that

15   get to a more fundamental question about whether the judiciary

16   can tell the executive how to structure its own affairs.

17             It's not a question that's presented, but I think

18   it's something to keep in mind.  And I noticed it -- as I was

19   thinking about the case -- that there is kind of an irony

20   there.  Because these are internal -- internal executive

21   branch notification provisions.  And I think the executive is

22   entitled to make those kind of judgments to enable the

23   solicitor general to make informed decisions about what kinds

24   of cases merit an appeal.

25             I am fully prepared here this morning to address any

1    of the other statutory provisions that the defendants have

2    cited in their brief, and I would be happy to answer any

3    questions.  I don't know if I have exceeded my time, but I

4    would defer to the court in terms of how it would like me to

5    proceed at this juncture.  I have come a long way, and I am

6    happy to spend my time as would best be suited.

7              JUDGE MOLLWAY:  Let me ask about the government's

8    position on the ex-post facto issue.

9              MR. ROTKEY:  Uh-huh?

10              JUDGE MOLLWAY:  In your brief, you suggest that the

11    defendants really are worried about nothing because --

12              MR. ROTKEY:  I think -- if I recall, Your Honor --

13    not to interrupt you, I apologize --

14              JUDGE MOLLWAY:  Go ahead.

15              MR. ROTKEY:  A lot of what we heard -- and I

16    appreciate Your Honor's question -- a lot of what we heard

17    this morning is, if this practice is upheld, then what's next?

18    And then what's next after that?  And, again, with all due

19    respect, we have to focus on what's before us today, not

20    hypothetical questions about what might happen in the future

21    if Congress decided to do other things.

22              And, with regard to the ex-post facto provisions,

23    Your Honor, there may well be -- that was raised, as

24    Your Honor, Judge Mollway, noted, in connection with some

25    standing arguments that we have advanced about why certain of

1   the claims are not really properly before the court at this

2   time.  And, in particular, the defendants have challenged

3   Sections 401(a) and (b), which curtailed the district court's

4   discretion to depart on certain grounds.  It doesn't eliminate

5   your discretion to depart, it just curtails it on certain

6   grounds in the approximately two percent of cases that involve

7   child abuse or sex offense crimes.

8          And the defendants have raised a constitutional

9   challenge to this curtailment of discretion.  And one of the

10  arguments that we have made, Your Honors, is that there really

11  is no standing to consider these claims.  And there is an ex-

12  post facto reason here:

13         First of all, three of the four defendants now

14  before the court in these consolidated cases have been

15  convicted of crimes other than child abuse or sex offense.

16  The only defendant who has been convicted of a qualifying

17  predicate is Mr. Schnepper.  But yet, as to him, Your Honor,

18  the ex-post facto clause would probably -- and my

19  understanding is, the government's position has not been

20  represented in writing formally -- it will be -- that there is

21  an ex-post facto clause limitation, and that these -- the

22  curtailment of these departure grounds, as applied to

23  Mr. Schnepper, can't be reconciled with the ex-post facto

24  clause.  And, so, as a result, the question of whether these

25  provisions are generally unconstitutional, it's not posed,

1    because none of these defendants has standing to argue about

2    them; none is aggrieved by these particular provisions.

3              JUDGE MOLLWAY:  But some of the provisions, the

4    government's position is, do apply --

5              MR. ROTKEY:  Yes.

6              JUDGE MOLLWAY:  -- to all cases, including cases in

7    the pipeline pre-Protect Act.  And one of those is the

8    reporting requirement.

9              MR. ROTKEY:  Yes, that's correct.  And that has long

10   existed.  The reporting requirement has long been on the

11   books; this is just a modification.  Effectively -- and one

12   other point I meant to make about the reporting requirements:

13   All it really does is, it takes a certain class of cases for

14   which notice had been discretionary.  It had been up to the

15   U.S. Attorney whether they wanted to appeal.  And it now makes

16   it mandatory.  That's the twist.  That's the novelty of these

17   reporting requirements.  But the notion of the reporting

18   requirements themselves are new is not correct.  The Protect

19   Act preserves and perpetuates but amends those reporting

20   requirements in furtherance of the objectives of Title Four.

21             And the reason that we believe that the majority of

22   these provisions should be applied is because that's what the

23   Supreme Court tells us, is that we ordinarily apply the law in

24   effect on the date of a crime.  Now, there may be ex-post

25   facto constraints, but I don't believe that the defendants

1    generally have argued that there would be some ex-post facto

2    problem in -- for example, the provisions -- I am trying to

3    think... there are provisions regarding the documents that the

4    court is obliged to provide to the Sentencing Commission.  I

5    don't see where there's an ex-post facto problem there.  The

6    defendants have challenged the written statement of reasons

7    that a court must give now when it departs -- on a prospective

8    basis.  I don't see where there's any application to these

9    defendants or any ex-post facto problem there.

10           There may be a connection with the standing argument

11   in the application of specific changes that are made, if they

12   are disadvantageous, in cases that were already in the

13   pipeline, but I don't think, more generally, there's any -- I

14   think we do apply the law in effect at the time.  And the

15   Protect Act is the law that is in effect now and should be

16   applied.

17           JUDGE GILLMOR:  Did you have a question, Judge Kay?

18           JUDGE KAY:  No, actually, I was going to ask a

19   question on the ex-post facto.

20           JUDGE GILLMOR:  I would like you to answer the issue

21   raised by Mr. Wolff, that Congress couldn't do directly what

22   they are trying to do indirectly, and that is, restrict the

23   court from considering certain types of evidence at

24   sentencing.

25           MR. ROTKEY:  I would be happy to, Your Honor.

1          I must say that I am taken a little bit aback; I

2    didn't read any of the defendants' briefs to kind of raise an

3    argument about evidence that can be considered at sentencing.

4    I may be mistaken, but -- let me just say, generally, I think

5    the best response about Congress not being able to do

6    directly... it seems to me -- and Mistretta makes very

7    clear -- that Congress has the power to control the scope of

8    judicial discretion at sentencing.  And I think the Supreme

9    Court has repeatedly said that if Congress wanted to, Congress

10   could adopt strict determinant sentencing under which judges

11   would have zero discretion -- no discretion.  Congress could

12   say, if you are convicted of armed bank robbery, you get 15

13   years in prison; that's it.  And so it seems to me, if

14   Congress can -- and that has been long upheld and repeatedly

15   upheld as a constitutional exercise of Congress' authority.

16   And I cite the Chapman decision of the Supreme Court, from

17   1991, which is in our brief, which is the most recent

18   exposition of that principle.

19          And, so, if we can have strict determinant

20   sentencing, if Congress could have done so, it seems to me

21   there's lots of flexibility, there's lots of room for Congress

22   to have done directly here what it's asked the Sentencing

23   Commission to do.  And I think, far from believing that

24   Congress was trying to duck the issue, I think Congress wanted

25   to benefit from the commission's expertise.  That's why

1    Congress asked the commission to get involved here, was

2    because the commission is the expert.  The commission does

3    have almost 16 years now of accumulated wisdom over how the

4    guidelines are to be implemented.  And so I don't see anything

5    impermissible.  I don't think Congress is trying to get around

6    anything.

7            And to the extent that this is being -- the two

8    broad issues in Mistretta, Your Honor, the two broad

9    constitutional challenges were a delegation challenge and a

10   separation of powers challenge.  And the defendants have

11   focused here today, in their papers at least, on the

12   separation of powers issue.  And to the extent now we are

13   talking about, well, this has really now become a delegation

14   issue, that Congress can't delegate this to the commission,

15   first of all, again, I don't believe that a delegation

16   challenge has been raised in the papers; but, again, for the

17   reasons that I have stated, I think this is fully consistent

18   with what Congress can and could not do.

19           We may disagree about the wisdom of Congress asking

20   the commission to get involved here, but that's not -- with

21   all due respect, that's not a matter for judicial cognizance.

22   All we are concerned about here is the Article Three

23   limitations.  We are not talking about the wisdom of these

24   policy decisions.

25           Who knows what Congress was doing and why they asked

1    the commission to get involved?  I believe it's because of

2    their expertise, but, again, I don't see how that factors into

3    the constitutional analysis.  And that's what we are here to

4    focus on, is whether there's been some transgression of the

5    Article Three's limitations.

6              Unless there are further questions...

7              JUDGE GILLMOR:  I have a question.

8              MR. ROTKEY:  Yes?

9              JUDGE GILLMOR:  How do you see the judge's role with

10   respect to the one point that Mr. Wolff mentioned?

11             MR. ROTKEY:  A couple of things, Your Honor.

12             Again, I hate to be redundant here, but I don't

13   believe that any of these defendants is affected by the

14   three-point provision, so I'm not sure why it's being raised.

15   I don't think any of these defendants -- I may be mistaken,

16   but I don't believe that that's an issue.

17             But, in any event, the notion on the third point, at

18   most -- again, that would be an ex-post facto consideration --

19   all that would mean is that there's some problem, that if it's

20   going to be disadvantageous, we don't apply it to an

21   individual defendant.

22             JUDGE GILLMOR:  Well, I am asking you how you apply

23   it, if it did apply.

24             MR. ROTKEY:  Well, the provision says that, now, the

25   third point may not be granted without a government motion.

1    And that is very similar to the procedure that Congress and

2    the commission used in connection with 5(k) motions for

3    substantial assistance, that the court has no power to grant a

4    5(k) departure unless the government first moves for one.  And

5    I think that's exactly -- I think Congress probably used that

6    as a template in connection with the third point.  But I don't

7    see where that violates --

8            JUDGE GILLMOR:  So does the court have any role

9    deciding whether or not the one point is appropriate or not?

10           MR. ROTKEY:  I think -- I haven't focused on this,

11   Your Honor, but I would think, by analogy to the 5(k), that it

12   absolutely does.  There is an antecedent issue, which is

13   whether the government has moved for the third point.  I think

14   if the government doesn't move -- again, drawing on the 5(k)

15   and the Supreme Court's decision in Wade, we normally don't

16   scrutinize the prosecutor's motives for not filing a motion

17   for a 5(k) departure unless there is some unconstitutional

18   motive.

19           So I think you view it as, number one, if the

20   government doesn't move, and there's no unconstitutional

21   motive, then I think that's the end of the matter.  And if the

22   government does move, then I think it's up to the court to

23   make a judicial determination whether or not that one point is

24   appropriate based on the timing of the plea, which I believe

25   is one of the considerations.  But, again, the mechanics about

1   how we implement the third point, I think -- to say that there

2   may be some provision, some issue about how it's

3   implemented -- I mean, what we are talking about here, let's

4   make no mistake about it, the defendants have asked this court

5   for the most extraordinary relief that a federal court is

6   empowered to give, and that is a declaration of

7   unconstitutionality.  And so -- there's a wide gap between

8   saying there may be a problem with the implementation or the

9   mechanics of how you implement one provision and conducting

10  that awesome act of declaring a federal statute

11  unconstitutional across the board.  And that's the relief that

12  they have sought.  And I think they have come well short of

13  overcoming all the presumptions and all the burdens that they

14  have to deal with to demonstrate how and why there is some

15  requirement -- or some obligation on the part of this court to

16  exercise that awesome authority.

17          And, so, because of those shortcomings, because of

18  the presumptions, and because we think that Title Four is

19  perfectly consistent with Congress' authority, as recognized

20  by the Supreme Court, we ask the court to deny the defendants'

21  motion.

22          JUDGE GILLMOR:  Thank you, Mr. Rotkey.

23          MR. ROTKEY:  Thank you, Your Honors.

24          JUDGE GILLMOR:  Mr. Wolff, did you wish to reply?

25          MR. WOLFF:  Briefly, Your Honor.

1          Let me focus first, briefly, on the subsection L

2    that Mr. Rotkey referred to.  That's the so-called reporting

3    requirement.  And while it is true that the Department of

4    Justice had a reporting requirement before the Protect Act,

5    the latest reporting requirement is a direct response to the

6    Protect Act.  And I thought it was somewhat ironic that the

7    government's argument here is that the judiciary can't tell

8    the executive branch, basically, anything about how to

9    structure its internal policies, and yet their internal

10   policies are a direct response to the congressional mandate

11   set forth in Subsection L.  So apparently they are quite

12   content to have the Congress do so, and -- all I can say is

13   that we are not so content.

14         That illustrates one of the problems here.

15         And I think the government's argument comes down to

16   this -- and they have almost said it, but they haven't quite

17   said it:  There really is nothing that couldn't be done by

18   some other Congress, in terms of directing the Sentencing

19   Commission to do one thing or another, and -- and that's their

20   position.

21         And while it is probably the case that Congress

22   could directly legislate a system of mandatory sentences, when

23   Congress legislates, they are constrained by the exhaustive,

24   finely wrought procedures -- I'm quoting here -- that are set

25   forth in Article One about how legislation is to be enacted.

1          And it doesn't say that you can do that by deferring

2     to a commission -- which has now -- whatever it was at the

3     time of Mistretta, it's now taken on, I would submit, the

4     unmistakable characteristic of a legislative commission.

5          And this, perhaps, is an analogy that illustrates

6     it:  If Congress had taken this exact statute and said,

7     instead of deferring to the Sentencing Commission, we're going

8     to defer this to a subcommittee of the judiciary committee,

9     who have great expertise in these matters, and they will write

10    out these guidelines, and they will respond to the directions

11    of the Protect Act, there wouldn't be any doubt, whatsoever,

12    that that was unconstitutional, because the Congress cannot

13    delegate to a subcommittee of itself its legislative power.

14         Here, we submit that -- and as I conceded at the

15    beginning, if this case is indistinguishable now from

16    Mistretta, if the situation now, post-Protect Act, is the same

17    as existed when Mistretta was decided, we lose.  But I don't

18    think that's the case.  We have an incremental but radical

19    shift in what was going on in 1984, and unless it is curbed

20    when it happens, unless it is recognized for what it is when

21    it happens, there won't be any principal basis on which to

22    say, at some future time, now you have gone too far.

23         So to respond to -- I forget which member of the

24    court it was who talked about the straw that breaks the

25    camel's back.  At some point you have to say, if we don't stop

1  an encroachment upon one branch's power by another at a

2  particular point, then we won't have a neutral principle which

3  can guide us at some future date as to what the limit would

4  be.

5          And it's not like pornography, where you recognize

6  it when you see it, in the words of one of the justices from

7  the past; you have to look at institutionally how this whole

8  system works and then make a determination as to whether,

9  institutionally, the Congress has begun to interfere in an

10 unconstitutional way with the power of the judiciary.  And we

11 submit that they have done so.

12         And, while it is true that it would be an unusual --

13 I don't know about "extraordinary" -- thing to so hold,

14 somebody has to do it.  And that's why I started off saying

15 that it's possible -- I hope I am right about this -- that

16 this is one of those things that, when looked back on from

17 some years down the road, was a defining moment, and did we

18 see as a society what had happened to the judicial power when

19 the Protect Act was enacted?  And did we recognize it and do

20 anything about it?  Or did we just let it go by and say, we

21 will take it up at a future date and hope that it all works

22 out?

23         Well, I think you know my answer.

24         Thank you.

25         JUDGE GILLMOR:  Thank you, Mr. Wolff.

1          Do any of the other defense counsel wish to speak?

2          MR. PARTINGTON:  No, Your Honor.

3          MS. TOWER:  No, Your Honor.

4          MS. BYRNE:  It's tempting, but, no, Your Honor.

5          JUDGE GILLMOR:  Thank you.

6          Then, if there is nothing further before the court,

7   at this time we will take the matter under submission.  And,

8   thank you.

9          We stand in recess.

10          THE BAILIFF:  All rise.

11          Court stands in recess.

12          (The hearing in the above-entitled

13          cause was concluded at 11:11 a.m.)

14                          - - -

15

16

17

18

19

20

21

22

23

24

25

46

1

2

3

4

5

6

7                                    -ooOoo-

8            I, Stephen B. Platt, Official Court Reporter,

9    United States District Court, District of Hawaii, do hereby

10   certify that the foregoing is a true and correct transcript of

11   proceedings before the Honorable Helen Gillmor, United States

12   District Judge.

13

14

15

16

17

18

19                                    /s/ Stephen B. Platt

20                          -------------------------------

21   MONDAY, APRIL 12, 2004       STEPHEN B. PLATT, CSR NO. 248

22

23

24

25